# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 25-CR-130 (RER)

————————————

UNITED STATES OF AMERICA

VERSUS

MAYNOR PEREZ BATEN

————————————

**MEMORANDUM & ORDER**

————————————

**RAMÓN E. REYES, JR., District Judge:**

A jury convicted defendant Maynor Perez Baten ("Defendant") of illegal reentry in violation of 8 U.S.C. § 1326(a). Before the Court are Defendant's post-trial motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial pursuant to Federal Rule of Criminal Procedure 33. (ECF No. 67 ("Def. Mot.")). Defendant argues that the government's evidence was insufficient to prove beyond a reasonable doubt that he was actually removed from the United States, and, alternatively, that the government's fingerprint expert testified beyond the scope of the Court's in limine ruling, warranting a new trial. After reviewing the record, and for the reasons set forth herein, the Court denies the motions.

**BACKGROUND**

I.      Factual Background[1]

On February 28, 2012, following a hearing before an immigration judge at which Defendant admitted that he was a citizen of Guatemala, that he had entered the United States illegally, and that he never had permission to be in the United States, Defendant was ordered removed. (GX 1A–1C (audio recordings of the February 28, 2012 hearing); GX 2G (order of removal)). On April 10, 2012, roughly six weeks after the removal order issued, the Department of Homeland Security ("DHS") generated a Form I-205 Warrant of Removal/Deportation (the "warrant of removal") bearing Defendant's name ("Maynor Enrique PEREZ BATEN"), his unique alien registration number ("A-number"), and a color photograph affixed at the time the document was created. (GX 2H at 1–2; Tr. at 72:1–16, 98:13–14).

The warrant of removal was executed on May 22, 2014. (GX 2H at 2). The executed warrant lists the "Port, date, and manner of removal" as "AEX, LA; 5/22/14; ICE Flt[.] 141486," reflecting a removal flight departing Alexandria, Louisiana. (*Id.*; Tr. at 96). The line labeled "Departure witnessed by" bears the stamp of Jeremy Bacon, then an immigration enforcement agent in Jena, Louisiana, who testified that he alone had access to that stamp and that the field is not completed until officers "witness that subject depart the United States." (Tr. at 92, 97). The warrant also contains, on the line labeled

---

[1]The following facts are drawn from the transcript of the trial held on March 9 and 10, 2026 ("Tr."), the transcript of the final pretrial conference held on February 10, 2026 (ECF No. 74) ("FPTC Tr."), the transcript of jury selection held on March 9, 2026 (ECF No. 75), the exhibits received at trial ("GX" and "DX"), and the parties' motion papers (ECF No. 69 ("Gov't Opp."); ECF No. 70 ("Def. Reply")).

"Signature of alien being fingerprinted," the printed name "Perez," and a fingerprint of the right index finger of the person removed. (GX 2H at 2; Tr. at 74:5–6, 139:5–6).

At trial, Bacon had no independent memory of the May 22, 2014 removal. (Tr. at 92:2, 96:6–9, 102:17–25, 105:4–12). He instead described the verification procedure that officers in Louisiana followed for every removal flight: on the morning of the flight or the day before, officers obtained a final manifest of the individuals approved for removal on that flight; officers escorted those individuals "from the facility . . . to the airport, observe[d] and watch[ed] them get on the plane, and verif[ied] that [the] plane would depart from the United States"; identities were verified against the name and photograph on the warrant of removal as "part of the verification process"; and the fingerprint was taken before boarding. (Tr. at 92–93, 98, 103–04).

On November 27, 2022, Sergeant Brian Lamb of the New York City Police Department pulled Defendant over while he was driving alone in Staten Island. (Tr. at 115:24–116:25, 117:2–6). Asked for his license, Defendant produced a Guatemalan passport bearing his name and photograph. (Tr. at 117:7–10, 120–21; GX 8A). Sergeant Lamb fingerprinted Defendant later that night. (GX 4C; Tr. at 123). Defendant was fingerprinted again on March 26, 2025, when he was arrested on the instant charge. (GX 5; Tr. at 20–21; Gov't Opp. at 3). Kim Crowell, an immigration services analyst with United States Citizenship and Immigration Services, testified that a noncitizen who has been removed must file a Form I-212 to request permission to return to the United States, and that no record in the relevant databases showed that Defendant ever filed one. (Tr. at 45–46, 50; GX 3).

Danielle Merritt, a senior fingerprint specialist with Homeland Security Investigations, testified as an expert in fingerprint analysis without objection. (Tr. at 130–33). Ms. Merritt began her career with a two-year, full-time FBI training program, is certified by the International Association for Identification, and has worked as a full-time fingerprint analyst for twenty-seven years. (Tr. at 130–32). She compared four impressions of a right index finger: the print on the executed warrant of removal (GX 6), the November 27, 2022 NYPD fingerprint card (GX 4C), the March 26, 2025 arrest fingerprint card (GX 5), and a fourth print, referred to at trial as "Fingerprint A." (Tr. at 136–39). All four impressions were "known" prints—prints "rolled from side to side to capture as much information as possible"—rather than latent prints. (Tr. at 136:6–10, 138:18–25). Ms. Merritt concluded that all four impressions "were made by the same finger," and one of her colleagues verified that conclusion. (Tr. at 144–47).

II.     The Expert Disclosure and the Court's In Limine Ruling

The government disclosed Ms. Merritt's expert report to the defense on December 19, 2025, and filed its expert notice—which set forth no opinions of its own and instead incorporated the two-page report by reference—on December 23, 2025. (ECF No. 30-1; Gov't Opp. at 10). The report stated a single conclusion: "The fingerprint impressions appearing on Exhibits 1.1 through 1.4 were visually examined and identified as being made by the same individual." (ECF No. 36-1 at 1). As to methodology, the report stated: "The above conclusions were established by a comparative analysis of the friction ridge detail for the impressions in question. The identifications were effected by manual comparison of the friction ridge detail in spatial relationship, one to another, with no unexplainable differences between the characteristics in question." (*Id.*)

4

In opposing the government's motions in limine, Defendant challenged the adequacy of the notice under Federal Rule of Criminal Procedure 16(a)(1)(G)(iii), and sought either preclusion of Ms. Merritt's testimony or an order limiting her to the disclosed opinion. (ECF No. 36 at 10–11). The government defended the sufficiency of its notice. (ECF No. 38 at 18–20). At the final pretrial conference on February 10, 2026, the defense explained its concern that the notice did not disclose the complete opinions the government intended to elicit, and observed that Ms. Merritt's report did not indicate that she had used the "ACE-V" method of fingerprint analysis, and that her curriculum vitae reflected only a single 2008 training on that method of analysis. (FPTC Tr. at 64–68, 66:18–23, 77:3–4). ACE-V is an acronym for the method's four steps: analysis, comparison, evaluation, and verification. (Def. Mot. at 4). If the Court was inclined to permit the testimony, the defense asked in the alternative "that her testimony be constrained to solely exactly what is in the notice that the government has provided, because that is what Rule 16 permits." (FPTC Tr. at 75:24–76:1).

The Court declined to preclude Ms. Merritt's testimony but adopted Defendant's alternative proposal: "That's what we'll do. . . . She can explain the methodology. She can say this is what a friction ridge detail comparative analysis is. I took this, I took that, I looked at this, and explain it. She can't get into anything beyond what she said here." (FPTC Tr. at 76:2, 76:14–18). The government confirmed its understanding. (FPTC Tr. at 76:19). The defense stated that, had the government noticed ACE-V, "we would file a *Daubert* challenge because there's no evidence in her CV that she has received sufficient training on that." (FPTC Tr. at 76:24–77:1). The Court confirmed with the government that "she's not going to talk about that." (FPTC Tr. at 77:10–14). The Court also observed that

5

cross-examination remained available: "It makes for far better cross-examination to let them talk about stuff they know nothing about and then rip them up." (FPTC Tr. at 77:7–9).

III.        Trial, Verdict, and the Instant Motions

Jury selection and trial commenced on March 9, 2026. (ECF No. 75; Gov't Opp. at 3). In addition to the evidence described above, the government elicited from Ms. Merritt testimony that fingerprints "form before you're born, so they are unique to each individual"—and, over a defense objection that the questioning went beyond the Court's prior ruling, that the uniqueness of fingerprints holds for each individual finger—as well as testimony that, "due to the biology of skin, the way your friction ridges are formed it's basically cemented into place throughout one's life." (Tr. at 134:3–18, 135:2–6). When the government asked Ms. Merritt to "explain how you compared the four fingerprints in this case," she described her examination in four steps: an analysis of the overall ridge flow of each print; a comparison of the ridge characteristics across prints; an evaluation of whether the prints were made by the same source; and verification of her conclusion by a colleague. (Tr. at 140:2–5, 143:7–144:3). The defense objected that this testimony tracked "the first step in the [ACE-V] methodology that we specifically raised at the in limine hearing." (Tr. at 141:3–4).[2] At sidebar, the Court concluded that Ms. Merritt was not discussing the ACE-V protocol but was using "analysis" in its ordinary sense—"[s]he's explaining her comparison, and then the analysis that led to that comparison"—and

---

[2] The transcript as filed renders the acronym "ACE-V" as "HV" at both references. (Tr. at 141:3, 141:6). That both references are to the ACE-V method is not in doubt. The transcript of the final pretrial conference, taken by a different reporter, renders the acronym correctly throughout. (FPTC Tr. at 66:18, 66:22–23, 76:22, 77:3). And Defendant's own motion quotes this sidebar with the same correction the Court makes here. (Def. Mot. at 8 (quoting Tr. at 141:3–4)).

6

overruled the objection, noting that Defendant could "cross her on it." (Tr. at 141:11–12, 142:6, 143:2–3). The defense objected once more when the government asked whether the verifier had reached the same conclusion as Ms. Merritt; the Court overruled that objection as well. (Tr. at 145:7–10).

On direct examination, the government itself elicited that Ms. Merritt did not compare the 2014 warrant-of-removal print directly to the 2022 or 2025 prints, instead comparing each of the other three impressions against Fingerprint A. (Tr. at 146:3–147:6). On cross-examination, Ms. Merritt acknowledged that each fingerprint set she received already bore the same name. (Tr. at 149:19–150:3). The defense did not cross-examine her about the ACE-V methodology or her training in it. (Tr. at 147–50).

The defense did not dispute at trial that Defendant was ordered removed in 2012, that he is a noncitizen, or that he was found in the United States on November 27, 2022. (Def. Mot. at 8). The sole contested issue was whether the government had proven that Defendant was actually, physically removed on May 22, 2014. The defense argued that the printed name "Perez" on the warrant of removal looked nothing like Defendant's cursive signature on the Notice of Rights form served on him on November 4, 2011, a document from his alien registration file (DX A; DX A-1 (certified translation); Tr. at 83:7–12, 84:13–22, 85:2–5), and that no witness remembered the actual removal itself. (Tr. at 178:12–186:15, 187:14–188:2). In rebuttal, the government expressly disclaimed reliance on the signature and on Bacon's memory—"I'm not asking you to rely on Mr. Bacon's personal memory of the defendant"—and pointed instead to the matching names on the documents and the A-number unique to Defendant, and, "most importantly, . . . the fingerprint matches." (Tr. at 190:12–13, 191:2–6, 192:2–21).

The Court instructed the jury that the removal element requires proof beyond a reasonable doubt of "the actual physical removal from the United States by the immigration authorities." (Tr. at 216:13–14). After deliberating for approximately forty-five minutes, the jury returned a verdict of guilty on the sole count. (Tr. at 223:23, 225:4–5, 225:23–25; ECF No. 63). Defendant timely filed the instant motions on March 24, 2026. (ECF No. 67). The government opposed on April 21, 2026 (ECF No. 69), and Defendant replied on May 4, 2026 (ECF No. 70).

## **LEGAL STANDARDS**

I.        Rule 29

Upon a defendant's motion, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *see* Fed. R. Crim. P. 29(c). A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (quoting *United States v. Hamilton*, 334 F.3d 170, 179 (2d Cir. 2003)). In considering such a challenge, a court "must credit every inference that could have been drawn in the government's favor," must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence," and must view the pieces of evidence "not in isolation but in conjunction." *Id.* at 94–95. The conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 95 (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A judgment of acquittal is warranted only where the evidence that the defendant committed the crime is "nonexistent or so meager that no reasonable jury could find guilt

8

beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

In conducting this review, a court "must be careful to avoid usurping the role of the jury," *Guadagna*, 183 F.3d at 129, because "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence," *United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021) (citation omitted). However, "specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty," and "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)). Where the court concludes that "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).

II.      Rule 33

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Although a district court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," that discretion must be exercised "sparingly" and only in "the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.

1992)). Unlike on a Rule 29 motion, the court does not view the evidence in the light most favorable to the government, but instead makes an "objective evaluation" of the evidence for itself. *United States v. Landesman*, 17 F.4th 298, 330–31 (2d Cir. 2021). Even so, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable," and may grant a new trial on the weight of the evidence alone only where the evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 187–89 (2d Cir. 2020) (citations omitted). A manifest injustice exists only where, after examining the entire case and taking into account all facts and circumstances, there is "a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. Relief is also available "where an evidentiary or instructional error compromised the reliability of the verdict." *Archer*, 977 F.3d at 188 (citing *Ferguson*, 246 F.3d at 136–37); *accord Landesman*, 17 F.4th at 331.

Where the claimed error concerns the government's expert-disclosure obligations, the court retains "broad discretion in fashioning a remedy for the government's violation of its obligations under Rule 16(a)," and relief is unavailable unless the violation caused the defendant "substantial prejudice"—that is, "the prejudice resulting from the government's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself." *United States v. Salameh*, 152 F.3d 88, 129–30 (2d Cir. 1998) (quoting *United States v. Sanchez*, 912 F.2d 18, 23 (2d Cir. 1990)).

**DISCUSSION**

I.     A Rational Jury Could Find Beyond a Reasonable Doubt That Defendant Was
Actually Removed from the United States

To convict Defendant of illegal reentry under section 1326(a), the government was required to prove, as relevant here, that Defendant was actually, physically removed from the United States before he was found in the country on November 27, 2022. (Tr. at 216:13–14). Defendant does not dispute the remaining elements. (Def. Mot. at 8). He argues that the two features of the warrant of removal that identify the person actually removed—the signature and the fingerprint—"pointed in, at best, opposite directions," and that no rational jury could find the removal element beyond a reasonable doubt on that record. (Def. Mot. at 16; Def. Reply at 2–3). The Court is not persuaded.

Here, crediting every inference in the government's favor, the trial evidence amply permitted a rational jury to find that Defendant was removed on May 22, 2014. First, the government introduced the executed warrant of removal itself, which bears Defendant's name, his unique A-number, his photograph, the port, date, and flight number of his removal, and the stamp of the officer who witnessed the departure. (GX 2H at 2; Tr. at 96–97). Second, Bacon described in detail the verification procedure that accompanied every removal flight out of Louisiana in that period: a final manifest, an escort from the facility to the airport, a name-and-photograph check against the warrant of removal, a fingerprint taken immediately before boarding, and officers watching the plane depart. (Tr. at 92–93, 98, 103–04). Third, Ms. Merritt testified, without meaningful contradiction, that the fingerprint on the executed warrant and the known prints taken from Defendant in 2022 and in 2025 "were made by the same finger." (Tr. at 144:8). The jury also heard that Defendant, when stopped in 2022, produced a Guatemalan passport in his own name,

11

and that no record shows he ever sought permission to return to the United States. (Tr. at 45–46, 50, 117:7–10; GX 3). Viewed in conjunction, this evidence supports a straightforward chain of inferences: the person fingerprinted at the aircraft on May 22, 2014 was the person removed; that fingerprint is Defendant's; therefore Defendant was removed. Other courts have sustained convictions under section 1326(a) on materially similar records. *See, e.g.*, *United States v. Pantaleon-Aviles*, 796 F. App'x 624, 625–26 (11th Cir. 2019) (per curiam) (evidence sufficient to prove defendant "was actually removed physically from the United States" where the government introduced an executed Form I-205 warrant of removal and a deportation officer testified that such a warrant "must be completed by an officer who witnesses personally the person leave the United States," even though the testifying officer had not personally witnessed the departure).

Defendant's principal counterargument rests on the signature line. The Court acknowledges that the printed name "Perez" on the warrant of removal does not resemble the cursive signature on the November 2011 Notice of Rights form in Defendant's alien registration file. (GX 2H at 2; DX A at 1). But the jury saw both documents, heard defense counsel press the discrepancy at length in summation, and heard the government respond that it was not relying on the signature at all. (Tr. at 178:12–186:15, 191:2–192:4). The choice between the competing inferences available on this record—that the discrepancy showed a different person was removed, or that a printed surname rendered at the airport in 2014 simply looks different from a cursive signature made two and a half years earlier—belonged to the jury. *See Jabar*, 19 F.4th at 81. The jury was entitled to resolve that choice against Defendant, particularly where the far more reliable identifier

12

on the same document—a rolled fingerprint, matched by a qualified examiner to two later sets of Defendant's known fingerprints—corroborated the inference of identity. A signature discrepancy does not render the government's proof "nonexistent or so meager" that no reasonable jury could convict. *Guadagna*, 183 F.3d at 130.

Nor is this a case in which the evidence gave "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *Valle*, 807 F.3d at 515 (quoting *Lorenzo*, 534 F.3d at 159). Defendant's theory of innocence requires the jury to have inferred that some other person, bearing Defendant's warrant, matching Defendant's photograph, and leaving Defendant's fingerprint, boarded ICE Flight 141486 in Defendant's place, and that immigration officers following the verification procedure Bacon described failed to notice. The government's theory required only that the executed warrant means what it says. The two theories do not stand in equipoise; the jury's choice between them was neither speculation nor "surmise," *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994), but an inference drawn directly from documentary evidence and unrebutted expert testimony.

Defendant's remaining attacks on the fingerprint evidence—that the discipline has drawn scholarly and judicial scrutiny, that Ms. Merritt expressed her conclusion with absolute rather than probabilistic certainty, that she compared the four prints through a common exemplar rather than side by side, and that she received the prints pre-labeled with Defendant's name—go to weight, not sufficiency. Each of these points was available to the defense at trial; several were in fact before the jury—one elicited by the government itself on direct examination, one by the defense on cross—and argued in summation. (Tr. at 146:3–147:6, 149:19–150:3, 185:11–186:6). The jury nonetheless credited Ms.

13

Merritt's conclusion, as it was entitled to do. On a Rule 29 motion, the Court "must defer to the jury's determination of the weight of the evidence and the credibility of the witnesses," *Reifler*, 446 F.3d at 94–95, and Defendant identifies no record evidence, as opposed to literature discussing error rates in other cases, suggesting that the identification here was wrong. Bacon's inability to remember this particular removal likewise goes to weight; the government disclaimed reliance on his memory, and routine-practice testimony coupled with the executed warrant is a permissible foundation for the jury's finding. *See Pantaleon-Aviles*, 796 F. App'x at 625–26.

In sum, this is not a record on which guilt and innocence were fairly balanced; it is a record on which the jury was asked to choose between an executed removal document corroborated by a fingerprint match and a conjecture—that someone other than Defendant was removed—that no witness or other evidence supported. Accordingly, Defendant's motion for a judgment of acquittal is denied.

II.     The Interests of Justice Do Not Require a New Trial

Defendant seeks a new trial on two grounds: that the verdict is against the weight of the evidence, and that the admission of Ms. Merritt's expanded testimony, in claimed violation of the Court's in limine ruling, compromised the reliability of the verdict. (Def. Mot. at 16–19). The Court rejects each in turn.

A. The Verdict Is Not Against the Weight of the Evidence

Evaluating the evidence objectively and weighing it for itself, *see Landesman*, 17 F.4th at 330–31, the Court reaches the same conclusion the jury did. The executed warrant of removal, the verification procedures Bacon described, and the fingerprint match are mutually reinforcing; the signature discrepancy, while real, is the kind of

14

imperfection in a documentary record that a factfinder may reasonably discount, not evidence that "preponderates heavily against the verdict." *Archer*, 977 F.3d at 188. Having presided over the trial and heard the witnesses, the Court harbors no "real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. A new trial on this ground is unwarranted.

B.  Ms. Merritt's Testimony Did Not Exceed the Court's In Limine Ruling

Defendant's second ground requires the Court to revisit the scope of its own ruling. At the final pretrial conference, the Court limited Ms. Merritt's testimony to the opinion and methodology disclosed in her report: she could "explain the methodology," could "say this is what a friction ridge detail comparative analysis is," and could describe her examination—"I took this, I took that, I looked at this"—but could not "get into anything beyond what she said here." (FPTC Tr. at 76:14–18). That the ruling permitted explanation, and not mere recitation, is clear from the exchange that produced it: asked whether Ms. Merritt "could only read off what's on here," the Court answered, "No." (FPTC Tr. at 76:4–6). Defendant contends that Ms. Merritt crossed that line when she testified to the uniqueness of fingerprints, their immutability over a lifetime, the types of identifying features on a finger, and the four steps of her examination, which Defendant equates with the ACE-V protocol the government had confirmed she would not discuss. (Def. Mot. at 17–18; Def. Reply at 3–4).

The Court adheres to the view it expressed at trial. Ms. Merritt's testimony about uniqueness and immutability supplied the foundational premises without which her disclosed opinion, that four impressions "were made by the same individual," would have been unintelligible to the jury. An expert permitted to state an identification opinion must

15

be permitted to explain why fingerprints are capable of identifying anyone at all. Indeed, the Court said as much at the final pretrial conference, in the same breath as the limitation Defendant now invokes: Ms. Merritt was "an expert in comparative analysis of friction ridge detail"; she could "tell the jury why that's a valid way of doing fingerprint analysis"; and "[t]hat's what she's limited to." (FPTC Tr. at 77:11–15). Her testimony about ridge endings, dividing ridges, and the relationships between them explained what a "comparative analysis of the friction ridge detail" examines, which is precisely what the disclosed methodology described and what the Court's ruling contemplated. (ECF No. 36-1 at 1; FPTC Tr. at 76:14–18).

The four-step testimony presents the closest question, and the Court is mindful that it confirmed with the government at the final pretrial conference that Ms. Merritt was "not going to talk about" ACE-V. (FPTC Tr. at 77:10–14). But Ms. Merritt did not talk about ACE-V. She never used the acronym, never claimed training or certification in that protocol, never described its formal requirements or error rates, and never invoked its standards to support her conclusion. Indeed, the acronym was uttered only twice during her examination—once by defense counsel and once by the Court, both at a sidebar conference held outside the jury's hearing. (Tr. at 141:1, 141:3, 141:6, 142:7). What she described is her own examination in this case, recounted in ordinary language. (Tr. at 143:7–144:3). As the Court observed at sidebar, she used "analysis" in its lay sense: "[s]he's explaining her comparison, and then the analysis that led to that comparison." (Tr. at 141:11–12). That the generic steps of any careful comparison can be mapped onto the ACE-V acronym does not convert a description of her own work into testimony about a formal methodology the disclosure never mentioned. Her brief account of a colleague's

16

verification likewise recounted a step in the examination she performed in this case, not the requirements of any formal protocol. (Tr. at 144–47). Ms. Merritt's testimony stayed within the boundaries the Court set, and the admission of that testimony was not error, much less an error that "compromised the reliability of the verdict." *Archer*, 977 F.3d at 188.

C. Even Assuming Error, Defendant Has Not Shown Substantial Prejudice

Even crediting Defendant's characterization of Ms. Merritt's testimony as exceeding the noticed disclosure, a new trial would not follow. The remedy for a Rule 16 disclosure shortfall lies in the Court's discretion, and post-trial relief requires "substantial prejudice": prejudice flowing from the timing of the disclosure, not from the force of the evidence itself. *Salameh*, 152 F.3d at 129–30.[3]

Defendant identifies no such prejudice. The opinion that convicted him—that the print on the executed warrant of removal and his known prints "were made by the same individual" (ECF No. 36-1 at 1)—was disclosed in the government's notice months before trial, and Defendant does not contend that Ms. Merritt was unqualified to perform the friction-ridge comparison her report described. (Def. Reply at 5 n.7). The challenged additions were background: uniqueness, permanence, feature types, and a step-by-step narration of the same comparison. Defendant does not explain how earlier notice of those subjects would have altered his trial preparation in any way that mattered, and the record shows that the defense possessed, and used, the materials for the attacks that actually

---

[3] Because the Court concludes that Ms. Merritt's testimony did not exceed the scope of the in limine ruling and that Defendant has not shown substantial prejudice in any event, the Court does not reach the government's argument that Defendant's challenge to the adequacy of the disclosure was untimely. (Gov't Opp. at 10).

bore on the identification: the jury heard that Ms. Merritt never compared the 2014 print side by side against the 2022 and 2025 prints, the defense elicited on cross-examination that each fingerprint set she received already bore the same name, and the defense argued both points in summation. (Tr. at 146:3–147:6, 149:19–150:3, 185:11–186:6).

Defendant's principal theory of prejudice is that he relied on the Court's ruling in forgoing a *Daubert* challenge to Ms. Merritt's qualifications in ACE-V. (Def. Mot. at 17–19; Def. Reply at 4–5). The Court is not persuaded. The premise of the forgone challenge, that Ms. Merritt applied a formal methodology in which she lacked training, is the same characterization of her testimony that the Court has already rejected. Her opinion rested on the visual comparison of known prints disclosed in her report—the very testimony the Court permitted, and which Defendant does not dispute she was qualified to give. (Def. Reply at 5 n.7). Ms. Merritt had by then worked as a full-time fingerprint analyst for twenty-seven years. (Tr. at 132:4–6). A *Daubert* motion aimed at her credentials in a protocol she neither invoked nor purported to apply would not have changed what the jury heard. And to the extent Defendant now argues that the reliability of fingerprint identification generally warranted a hearing, that argument was available to him from the moment the government noticed a fingerprint expert in December 2025; nothing in the timing of Ms. Merritt's trial testimony prevented him from raising it.

At bottom, the jury convicted Defendant because an executed warrant of removal bore his photograph, his A-number, and his fingerprint, and because the defense's alternative explanation asked the jury to infer a misidentification that no evidence supported. Ms. Merritt's descriptions of ridge flow and verification did not tip that balance, and their admission does not leave the Court with any concern, much less a real one, that

18

an innocent person has been convicted. *Sanchez*, 969 F.2d at 1414. Accordingly, Defendant's motion for a new trial is denied.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for a judgment of acquittal pursuant to Rule 29(c) or, in the alternative, for a new trial pursuant to Rule 33 is denied.


SO ORDERED.


/s/ Ramón E. Reyes, Jr.
RAMÓN E. REYES, JR.
United States District Judge

Dated: August 4, 2026
        Brooklyn, New York